**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **EMMETT LOCKHART,** | : | |
| | : | |
| **Petitioner** | : | |
| | : | **CIVIL NO. 3:CV-06-1291** |
| **v.** | : | |
| | : | **(Judge Caputo)** |
| **GEORGE N. PATRICK,** | : | |
| | : | |
| **Respondent** | : | |

**M E M O R A N D U M**

## I.    Introduction

Petitioner Emmett Lockhart, a state prisoner confined at the Houtzdale State

Correctional Institution in Houtzdale, Pennsylvania, has filed a Petition for Writ of

Habeas Corpus pursuant to 28 U.S.C. § 2254.  Mr. Lockhart, proceeding *pro se*,

challenges his 2001 Cumberland County Court of Common Pleas, Carlisle,

Pennsylvania, convictions for first degree murder, kidnapping, arson, robbery, theft

by unlawful taking, abuse of a corpse, criminal conspiracy homicide, criminal

conspiracy arson, criminal conspiracy robbery, criminal conspiracy theft by unlawful

taking, and criminal conspiracy abuse of corpse.  On July 23, 2001, Mr. Lockhart

was sentenced to life imprisonment without the possibility of parole on the homicide

conviction, and to a concurrent aggregate term of ten to twenty years' incarceration

on the remaining counts.[1]

---

[1]  The court takes judicial notice of the docket sheet in *Commonwealth v. Lockhart*, No. CP-21-CR-0001591-2000, available through Pennsylvania's Unified Judicial Docket System docket research at: http://ujsportal.pacourts.us/.

Mr. Lockhart presents seven grounds for relief.  (Doc. 2, ECF pp. 2-3, Pet.'s Mem. in Supp. Habeas Pet.)  Respondent has filed a response to the petition, supporting memorandum of law and exhibits.  (Docs.  22, 23 and 24.)  Mr. Lockhart did not file a response to Respondent's filing.

After a thorough review of the entire state court record, the pleadings made available to the court, and the applicable law, the court finds that, for the reasons set forth below, Mr. Lockhart's petition for writ of habeas corpus is denied.

## II.   Background & Procedural History

### A.   The Murder, Investigation and Trial Issues

Due to the issues raised by Mr. Lockhart, a detailed discussion of the facts that led to his conviction is required.

In 2000, the victim, Sydney Bull, was a senior at Shippensburg University. (Doc. 24-2, ECF p. 50).  On the morning of Monday, April 24, 2000, he had just returned to Shippensburg University after spending Easter weekend with his family in Norristown, Pennsylvania.  (*Id.*, ECF p. 46.)  He spent most of the day with his cousin, Lance Cpl. William Gant, who was visiting the area after completing Marine Corps Basic training.  (Doc. 24-3, ECF p. 102.)  The two cousins had breakfast together and then planned to lift weights.  (*Id.*, ECF p. 7.)  When leaving Sydney Bull's apartment for the gym, the cousins encountered Mr. Lockhart, who was known to Lance Corporal Gant as "Hassan".  (*Id.*)  After speaking to the victim, Mr. Lockhart got back into his car and left.  (*Id.*, ECF p. 9.)

After weight lifting, the two cousins returned to Mr. Bull's apartment.  Their plan was for Mr. Bull to drop off his cousin around 4:00 p.m., so he could catch a 5:00 p.m. bus.  (*Id.*, ECF pp. 13 and 41.)  However, they were still in the apartment around 3:30 p.m. or 3:45 p.m. because Mr. Bull was waiting for Hassan to return. (*Id.*, ECF p. 14.)  At this point Lance Corporal Gant grew concerned that he would miss his bus.  (*Id.*)  Finally, Mr. Bull agreed to drop his cousin off at his girlfriend's house so that she could take him to the bus.  (*Id.*, ECF p. 15.)  On the way, they passed Hassan in his car.  Both cars pulled over, Mr. Bull got out of his car and went over to speak with Hassan.  (*Id.*)  After a brief conversation, Mr. Bull returned to his car and told Lance Corporal Gant that he was going to meet up with Hassan later that evening.  (*Id.*, ECF p. 16.)

The evening of April 24, 2000, Sydney Bull had a meeting at a classmate's apartment to work on a group project that was due the following day.  (*Id.*, ECF p. 51-53; Doc. 24-11, ECF p. 90.)  At approximately 9:30 p.m., Mr. Bull looked at something in his bookbag and then asked to use the phone.  (Doc. 24-3, ECF p. 54-55.)  He told his study group he had to take care of something and would be back in 10 minutes to finish his part of the presentation.  (*Id.*, ECF p. 55.)  He did not take his bookbag with him.  (*Id.*, ECF p. 63.)  He never returned to the study group that evening or class the next day.  (*Id.*, ECF p. 56.)

On the first day of trial Dontae Chambers testified.  (Doc. 24-3, ECF pp. 74-99; Doc. 24-4, ECF pp. 1-45; Doc. 24-5, ECF pp. 1-84.)   While he admitted he had been arrested and charged for his involvement in the death of Sydney Bull, he

testified, and his counsel (Attorney Abeln) confirmed, that he had not been offered or promised any deals by the Cumberland County District Attorney's office in exchange for his testimony.  (Doc. 24-3, ECF pp. 71-73 and 76-77.)  He hoped that by testifying he would receive some leniency with respect to his sentencing, but was not guaranteed anything.  (*Id.*)  He then proceeded to testify on direct examination August 7, 2014 as to the victim, Sydney Bull's, last hours of life.  (Doc. 24-3, ECF pp. 74-99; Doc. 24-4, ECF pp. 1-45; Doc. 24-5, ECF pp. 1-84.)

Mr. Chambers testified that on the evening of April 24, 2000, he, Mr. Lockhart,[2] and Mr. Norris (co-defendant)[3] were smoking marijuana at the Chi Gamma Iota (XGI) Fraternity House near Shippensburg University where Mr. Norris resided.  (Doc. 24-3, ECF pp. 85-88.)  Mr. Chambers knew Mr. Lockhart and Mr. Norris by their nicknames, Hassan and Smokey.  (*Id.*, ECF p. 87.)  While there, Mr. Norris asked Mr. Chambers to help them rob someone.  Dontae Chambers agreed. (*Id.*, ECF pp. 88-89.)  The three men got into a blue Ford Probe.  (*Id.*, ECF pp. 89, 90-91.)  Emmett Lockhart drove co-defendant Matthew Norris and Dontae Chambers to the Heiges Field House parking lot at Shippensburg University where they picked up Sydney Bull.  (*Id.*, ECF pp. 87, 96, 99 and 192.)  Mr. Norris then gave Mr. Lockhart directions to the mountains near Shippensburg, or an area called "the wall."  (*Id.*, ECF p. 99; Doc. 24-4, ECF p. 3.)  During the car ride, Mr. Norris pointed a pistol grip shotgun at Mr. Bull.  (Doc. 24-3, ECF p. 99; Doc. 24-4, ECF p. 6.)  Upon

---

[2]  Mr. Lockhart is a black male.  (Doc. 24-3, ECF pp. 88-89.)

[3]  Mr. Norris is a white male.  (Doc. 24-12, ECF p. 83.)

arriving at their destination, Mr. Lockhart let Sydney Bull out of the back seat of the car while Mr. Norris and Mr. Chambers got out on the right side of the car.  (Doc. 24-3, ECF p. 99.)  As Mr. Norris started walking Sydney Bull at gunpoint into the woods, Mr. Lockhart retrieved a red gas can out of the trunk of the car.  (Doc. 24-4, ECF p. 7.)  After joining Mr. Norris, Mr. Chambers and Mr. Bull, Mr. Lockhart put down the gas can and rushed at the victim and they started to wrestle.  (*Id*., ECF p. 8.)  When Mr. Bull escaped Mr. Lockhart's clutches, Mr. Norris pointed the shotgun at Sydney Bull.  (*Id*., ECF p. 9.)  Mr. Bull begged Mr. Norris for two or three minutes not to shoot him.  (*Id*., ECF p. 10.)  Mr. Norris then shot Sydney Bull in the face, specifically in the nose and mouth area.  (*Id*., ECF p. 11.)  The shotgun blast propelled Sydney Bull backward landing on his back.  (*Id*.)  Mr. Norris grabbed the victim's duffel bag and threw it to the side of the victim and then proceeded digging through Sydney Bull's pockets removing money, his pager and other things.  (*Id*., ECF p. 12.)  In the interim, Mr. Lockhart poured gasoline on the body from head to toe.  (*Id*., ECF p. 13-14.)  Mr. Lockhart placed the gas can down approximately 10 to 20 feet from the victim's head and lit the gas can on fire.  (*Id*., ECF pp. 15-16.)  Mr. Norris lit a matchbook and tossed it on the victim's torso.  (*Id*., ECF p. 14.)  The fire engulfed the body and the surrounding ground.  (*Id*., ECF p. 15.)  Mr. Lockhart then drove Mr. Norris and Mr. Chambers back to Shippensburg.  (*Id*., ECF pp. 19-21.)  Mr. Lockhart and Mr. Norris instructed Dontae Chambers that if anyone asked, he had not seen either of them that day, didn't know where they were, and had not met with them.  (*Id*., ECF p. 20.)

During the murder investigation, Dontae Chambers told the police the story of what happened to Sydney Bull, as set forth above.  (Doc. 24-4, ECF pp. 30-41 and 58.)  He testified that the Pennsylvania State Police (PSP) investigators did not provide him with any details of the crime scene or the crime itself.  (*Id*., ECF p. 34.)  Although he denied any involvement in the victim's death numerous times when interviewed by the police, he did so because he was scared, knew he could be facing the death penalty or life imprisonment.  (*Id*., ECF p. 35.)

Toward the end of Mr. Chambers' direct testimony, the prosecution asked him if he told the police that an individual by the name of Bernard Adams was up on the mountain the day of the murder.  He responded "Yes," that he did give the police Bernard Adams' name, but further testified that, in fact, Bernard Adams was not up on the mountain.  (*Id*.)  Mr. Chambers stated he did not know why he gave the police Bernard Adams' name except for the fact that he had his "little brother selling drugs for him." (*Id*., ECF pp. 35-36.)  The trial court rested for the day upon the conclusion of Mr. Chambers' direct testimony.  (*Id*., ECF p. 39.)  Mr. Norris' counsel immediately requested a mistrial based the Commonwealth's failure to disclose exculpatory evidence.  Defense counsel learned for the first time during Mr. Chambers' direct examination that he had previously implicated Bernard Adams as a person involved in the murder.  Mr. Lockhart's counsel joined in the motion.  (*Id*., ECF pp. 41-42; Doc. 24-5, ECF pp. 10-12.)  Ultimately the Commonwealth conceded that Mr. Chambers' statement concerning Bernard Adams "was not given to the defense, ... [i]t was inadvertent on [the Commonwealth's] part."  (Doc. 24-5,

ECF p. 7.)  Without the jury present, the Commonwealth explained that the PSP Trooper who interviewed Mr. Chambers reported that he "claimed to be up at the wall with Bernard Adams waiting for Sydney Bull to come up with some other individuals."  (*Id.*, ECF p. 8.)  This information does not appear in any notes or reports related to the case.  (*Id.*, ECF p. 18.)  However, the Troopers who interviewed Mr. Chambers and were present at the time of this declaration were available for defense counsel to interview.  (*Id.*, ECF pp. 12-13.)  The Commonwealth stressed that although Mr. Chambers had identified Bernard Adams as being on the mountain, he did not implicate Bernard Adams in the shooting.  (*Id.*, ECF p. 8.)  The trial court held that

> based upon what I heard from the prosecutor, that this was not a bad faith attempt to submarine anybody.  He brought it out himself in direct examination.  It was, at most, inadvertent.

(*Id.*, ECF pp. 9-10.)  The trial court denied the motion for a mistrial.  (*Id.*, ECF p. 19.)

> I have had the opportunity to review the cases that both sides have provided to this Court.  I am going to deny the mistrial; although Mr. Costopoulos, Mr. Russo, I will give you the opportunity to choose whether you want to cross-examine Mr. Chambers now or after you have had the opportunity to review the circumstances regarding the statement with the troopers that took the statement.
>
> I am directing the Commonwealth to make those troopers available to the defense to be interviewed at length and to tell all the circumstances surrounding the giving of that statement.
>
> As I indicated before, Mr. Costopoulos and Mr. Russo, if you feel that a continuance in this trial is necessary before you call Mr. Chambers back, we would be prepared to do that also.

-7-

(*Id.*)  Both defense counsel elected not to take a recess or continuance, but to move forward with the cross-examination of Mr. Chambers.[4]  (*Id.*, ECF p. 22.)

When the trial resumed, Mr. Norris' counsel commenced his cross-examination of Mr. Chambers.  (*Id.*, ECF p. 25.)  When asked what he had told the police about Bernard Adams' involvement in the murder, Mr. Chambers responded "Really nothing."  (*Id.*, ECF pp. 27-28.)  Mr. Norris' defense counsel then proceeded to go over every statement Mr. Chambers made to police and during his direct testimony.  (*Id.*, ECF pp. 25-41.)  At that point, Mr. Norris' counsel asked Mr. Chambers, "Were you even up there, Dontae?  Because if you weren't, I want you to tell this judge and this jury because if you weren't, the most they can do to you is charge you with perjury."  (*Id.*, ECF p. 41.)  At that point, Mr. Chambers asked, "[m]ay I speak with my attorney?" and a recess was immediately taken, the jury excused, and a discussion was held on the record.  (*Id.*, ECF pp. 41-56.)

Mr. Abeln, Dontae Chambers' attorney, advised the court that his client wished to invoke his Fifth Amendment rights.  Counsel for the defense wanted him to do so in front of the jury.  (*Id.*, ECF pp. 43-44.)  The trial court disagreed and noted that if Mr. Chambers did invoke his Fifth Amendment rights he would advise the jury that Mr. Chambers "has elected to exercise his right not to incriminate himself and refused to testify any further."  (*Id.*, ECF p. 44.)  When defense counsel continued to object, the trial court invited counsel to provide case law in support of

---

[4]  It is worth noting that, later in the trial, Mr. Lockhart's counsel, as well as his co-defendant's counsel, had the opportunity to cross-examine the PSP members who were present when Mr. Chambers made the statement referencing Bernard Adams being on the mountain with him earlier that day.  (*See* Docs. 24-9, 24-10, 24-11.)

their argument.  (*Id.*, ECF pp. 44 and 46.)

Following a brief recess, Mr. Chambers was placed on the stand without the jury present.  (*Id.*, ECF pp. 49-54.)  The trial judge asked Mr. Chambers for his reasons for invoking the Fifth Amendment.  (*Id.*, ECF p. 50.)  Mr. Chambers responded "[d]ue to the fact that there was false testimony, I no longer wish to answer any questions that would further incriminate myself."  (*Id.*)  The trial court verified with Mr. Abeln and Mr. Chambers that his request was only related to false testimony given and not some other reason.[5]  (*Id.*, ECF pp. 50-51.)

The prosecution argued that Mr. Chambers' prior testimony was not perjured, but truthful, and that the recantation was false.  (*Id.*, ECF P. 52.)  The Commonwealth petitioned the trial court to grant Mr. Chambers immunity from perjury charges stemming from his testimony at the preliminary hearing and his trial testimony to that point.  (*Id.*, ECF pp. 52-54.)  The court accepted the resolution and Mr. Chambers was granted transactional immunity for any perjury charges emanating from his prior preliminary hearing and trial testimony up to the point that the questioning began anew.  (*Id.*)  However, he was not given immunity with respect to the murder charge he was facing as a result of his involvement in Sydney Bull's murder.  (*Id.*, ECF p. 54.)  Mr. Abeln and Mr. Chambers both confirmed that Mr. Chambers was willing and prepared to continue to testify under these terms of transactional immunity on perjury related exclusively to his earlier testimony.  (*Id.*, ECF p. 54.)

---

[5]  Earlier it was brought to the trial court's attention that Mr. Norris, during transportation, was making comments towards Dontae Chambers.  (*Id.*, ECF pp. 48.)

When Mr. Chambers' cross-examination resumed, he denied being present when Sydney Bull was murdered, ever seeing Matthew Norris or Emmett Lockhart the day of the murder, or knowing of their involvement in the murder.  (*Id.*, ECF p. 57.)  Mr. Lockhart's counsel then had the opportunity to cross-examine Mr. Chambers.  (*Id.*, ECF pp. 59-60.)  On redirect, Mr. Chambers denied telling the police that Mr. Bull was murdered near the wall, or that Mr. Lockhart doused his body with gasoline.  (*Id.*, ECF pp. 62-63.)  He confirmed that he told the police that Mr. Bull was shot, in the head, with a pistol grip shotgun, and then his body was doused with gasoline and then burned.  He also admitted that the police did not show him any pictures of Mr. Bull after he was shot or diagrams from his autopsy.  (*Id.*, ECF pp. 64-68.)  Mr. Chambers confirmed that the police "didn't tell me anything."  (*Id.*, ECF p. 71.)  Mr. Chambers' testimony following his receipt of transactional immunity on the perjury charges was consistent with the instructions he previously claimed the defendants gave him in the car on their way back from murdering Sydney Bull, *i.e.* he did not know where they were that fateful day.  (*Id.*, ECF pp. 83-84.)

While Mr. Chambers recanted much of his earlier testimony, many of the details of Mr. Chamber's story were consistent with physical evidence found at the scene or otherwise corroborated by information never released to the public.  These details included: the victim was shot once with a 12-gauge shotgun fatally injuring him; he was shot at a close distance, 12 inches or less; he was shot on the left side of his face near the corner of his mouth, the upper and lower lip; he fell backward

after being shot; his corpse was doused with gasoline and burned; his body was found approximately 50 feet from the pull off area along a mountain road; a melted plastic gas container was found several feet from the victim's head.  (*Id.*, ECF pp. 92-93; Doc. 24-6, ECF pp. 2-4, 7, 9, 14, 33 and 65-66.)  Also that someone rummaged through the victims front pockets, where he was known to keep his drugs, and that coins, keys, a frame for a pair of glasses, the remains of a pager and wallet were found near the body.  (Doc. 24-7, ECF pp. 3-4 and 11-12; Doc. 24-11, ECF pp. 85-86.)

Various members of the Pennsylvania State Police (PSP) testified about their investigation into Sydney Bull's murder on April 26, 2000, which started by questioning co-defendant Mr. Norris, as they learned he was a friend of the victim and may have seen him the day of the murder.  (Doc. 24-18, ECF pp. 19-20; Doc. 24-20, ECF p. 25; Doc. 24-13, ECF p. 74.)  Later it was learned that Mr. Norris sold drugs and the victim was his supplier.  (Doc. 24-20, ECF p. 35.)  Mr. Norris admitted to owning a 12 gauge shotgun.  (Doc. 24-18, ECF p. 34; Doc. 24-13, ECF p. 78; ECF 24-14, ECF pp. 1-3.)   Mr. Norris purchased Number 8 Shot a couple of days prior to the murder, the same type of ammunition used to kill the victim.  (Doc. 24-18, ECF p. 82.)  The area where Mr. Bull's body was found was specific to the XGI fraternity for some of their functions, including target shooting.  (*Id.*)   Mr. Norris gave inconsistent statements about his whereabouts at the time of the murder.  (*Id.*, ECF p. 41, 43-44, 49-50, 55-56; Doc. 24-14, ECF pp. 94-100.)  Mr. Norris' telephone records and his girlfriend's testimony contradicted many aspects of Mr. Norris' testimony.  (Doc. 24-14, ECF pp. 18-24; Doc. 24-16, ECF pp. 21-22, pp. 28-29, p.

57, p. 79 and p. 86.)  Finally, Sydney Bull's DNA was found within five inches from the end of Mr. Norris' shotgun.  (Doc. 24-21, ECF p. 44, p. 88; Doc. 24-22, ECF pp. 26-27.)

Petitioner, Emmett Lockhart, also known as Hassan, was interviewed by the PSP in June 2000.  He told the police he was a Shippensburg University student but did not attend class on Monday, April 24, 2000, because he was not prepared to turn in a school project that was due.  (Doc. 24-11, ECF p. 8.)  He stated he knew the victim, Sydney Bull, as he had cut his hair on one or two occasions but only saw him occasionally at school.  (*Id.*, ECF p. 9.)  He denied knowing the victim's telephone or pager number.  (*Id.*, ECF p. 9-10.)  He also denied knowing anyone from the Shippensburg fraternities or anyone named "Smokey".  (*Id.*, ECF p. 10.)  Mr. Lockhart additionally advised the PSP that he did not know or have any relationship with  "any white males."  (*Id.*, ECF pp. 10-11, p. 38.)  Mr. Lockhart provided the PSP with his cellphone and pager number.  (*Id.*, ECF pp. 11-12.)  When asked about his vehicles, he stated his girlfriend had a Ford Probe.  (*Id.*, ECF p. 19.)  He denied being a drug dealer or being involved in the death of Sydney Bull.  (*Id.*, ECF p. 32 and p. 38.)

At trial, James Lovell Carey, Mr. Bull's sophomore year roommate, testified.  (*Id.*, ECF p. 41.)  He stated that the victim sold drugs and cocaine on campus.  (*Id.*, ECF p. 43.)  He also testified that he sold drugs for a period of time during his career at Shippensburg University.  (*Id.*, ECF pp. 45-46.)  He testified that Emmett Lockhart supplied both him and the victim with drugs.  (*Id.*, ECF pp. 43 and 51.)  Mr.

Carey was present when Mr. Bull would page Mr. Lockhart,  who would then come to their apartment with the drugs. (*Id.*, ECF pp. 43 and 69.)  He further testified that Mr. Lockhart had the victim's phone number based on the fact that when Mr. Bull paged him, Mr. Lockhart would call Mr. Bull back.  (*Id.*, ECF p. 79.)

Mr. Carey also testified that he knew Mr. Norris prior to April of 2000.  Every time he met Mr. Norris, he was in the victim's company.  (*Id.*, ECF p. 46.)  In April 2000, Mr. Carey lived in the same apartment building, directly above the victim.  (*Id.*, ECF pp. 46-47 and 77.)  The afternoon of April 24, 2000, Mr. Carey looked down from his balcony and saw the victim and Mr. Norris sitting and talking.  (*Id.*, ECF p. 47.)  He briefly spoke to Mr. Bull.  (*Id.*)

Jacquin Ortiz, an inmate at the State Correctional Institution at Camp Hill testified that he shared a cell with Mr. Lockhart at the Franklin County Prison.  (Doc. 24-12, ECF p. 12 and p. 29.)  He asked Mr. Lockhart "why did you boys shoot the brother?" to which he responded "[h]e should have gave it up.  They had to do what they had to do."  (*Id.*, ECF p. 13.)  He believed Mr. Lockhart was talking about cocaine and money.  (*Id.*)  He also stated that Mr. Lockhart knew the police were coming for him and his girlfriend's car, which "he had to clean it up."  (*Id.*)

Brenda Varner, who knew both Mr. Norris and Mr. Lockhart, testified at trial.  (*Id.*, ECF pp. 80-81.)  Approximately two weeks before Mr. Bull's murder, while working at the Shippensburg Food Lion grocery store, Mr. Lockhart and Mr. Norris came into the store together.  (*Id.*, ECF pp. 82-83 and p. 89.)  She also observed them together on another occasion at a local Sheetz gas station where Mr. Norris

was standing outside of Mr. Lockhart's vehicle.  (*Id.*, ECF p. 86.)  The day after the murder, she saw Mr. Lockhart at a neighbor's house and observed his hands were scratched up.  (*Id.*, ECF p. 85.)  In the week following Mr. Bull's death, Ms. Varner saw Mr. Lockhart driving a blue Ford Probe.  (*Id.*, ECF p. 88 and 98.)

William Gardiner, a white male, testified to knowing Emmett Lockhart through mutual friends, the Gutshall brothers, who were also white. (Doc. 24-13, ECF pp. 4-5.)  They met fishing.  (*Id.*, ECF p. 21.)  Mr. Gardiner testified to purchasing marijuana from Mr. Lockhart.  (*Id.*, ECF p. 5.)  He would page Mr. Lockhart who would then contact him.  (*Id.*, ECF p. 6.)  Mr. Gardiner also knew Dontae Chambers and Mr. Norris.  (*Id.*, ECF p. 7.)   On April 25, 2000, Mr. Garner recalls contacting Mr. Lockhart to make a drug purchase.  When they spoke, Mr. Lockhart said he would come see him that afternoon, but never showed up that day.  (*Id.*, ECF pp. 10-11.)

The Commonwealth offered testimony that upon executing a search warrant for Sydney Bull's apartment, a phone list was found which contained Mr. Lockhart's pager number as well as Mr. Norris' number.  (*Id.*, ECF pp. 26-27.)  Following a search of another car Mr. Lockhart frequently drove, a white Maxima, a piece of paper was found in the center console that had the name Sydney on it and a telephone number.  (*Id.*, ECF p. 42.)  Between the time frame of January 2000 and April 2000, the victim's phone number appeared on Mr. Lockhart's phone records seven times.  (*Id.*, ECF p. 59.)  The records also verified that Mr. Lockhart called Mr. Gardiner on April 24, 2000 at approximately 6:04 p.m.  (*Id.*, ECF pp. 59-60.)

Mr. Norris testified at trial.  (Doc. 24-24, ECF pp. 51-97; Doc. 24-25, ECF pp. 1-69.)  He testified that he was involved in selling small amounts of marijuana and cocaine.  (Doc. 24-24, ECF p. 53.)  He testified that he knew Mr. Bull and never had a falling out with him.  (*Id.*, ECF p. 55.)  Mr. Norris testified he had never met Mr. Lockhart or "seen that man before in my life," prior to him being arrested for his involvement in Sydney Bull's murder.  (*Id.*, ECF p. 61.)

The morning of the last day of trial, the court met with counsel to discuss the points for charge.  (Doc. 24-27, ECF p. 4.)  The court stated that "[a]ll of Defendant Lockhart's points for charge will be covered," to which his counsel replied "[t]hank you."  (*Id.*)  The Commonwealth also withdrew its intention of seeking the death penalty.  (*Id.*)  The jury was then brought in and closing statements were presented.  The trial court then delivered the points of charge.  (*Id.*, ECF pp. 90 - 99; Doc. 24-28, ECF pp. 1-30.)  At the conclusion of the charge, the trial judge asked "counsel if they had any additions or corrections to [his] charge."  (*Id.*, ECF p. 29.)  All counsel responded "No."  (*Id.*, ECF p. 30.)

The jury eventually found Mr. Lockhart guilty of first-degree murder, kidnapping, arson, robbery, theft by unlawful taking, abuse of corpse, and five counts of criminal conspiracy.  (*See* 24-32, *Commonwealth v. Lockhart*, 839 A.2d 1157 (Pa. Super. Oct. 7, 2003)(Table, No. 484 MDA 2002)(unpublished op.).)

On May 12, 2001, Mr. Lockhart was convicted as indicated above.  He was sentenced to life imprisonment without the possibility of parole for the homicide conviction and directed to serve a concurrent aggregate term of ten to twenty years' imprisonment on the remaining counts.  (Doc. 24-29, Sentencing Hr'g. Tr.)  On

-15-

December 18, 2001, Mr. Lockhart filed post-sentence motions.  On March 6, 2002, the trial court denied Mr. Lockhart's post-trial motions.

### B.    Direct Appeal

On March 26, 2002, Mr. Lockhart filed a Notice of Appeal to the Pennsylvania Superior Court from the trial court's order of March 6, 2002.  On May 24, 2002, following Mr. Lockhart's filing of a Rule 1925(b) statement, the trial court filed a full opinion.  (Doc. 24-33, Cumberland Ct. Com. Pl., Op. re: Pa. R. A. P. 1925.)

The Pennsylvania Superior Court defined Mr. Lockhart's issues on appeal as follows:

> (1) whether the evidence was sufficient to support the convictions; (2) whether the verdicts were against the weight of the evidence; (3) whether the trial court erred in refusing to declare a mistrial after it disclosed during the trial that the Commonwealth had failed to provide exculpatory evidence during discovery; and (4) whether the trial court erred in refusing to inform the jury that a Commonwealth witness invoked his Fifth Amendment privilege during [Mr. Lockhart's] trial.

(Doc. 24-32, *Commonwealth v. Lockhart*, 839 A.2d 1157 (Pa. Super. Oct. 7, 2003)(Table, No. 484 MDA 2002)(unpublished op.).)  On October 7, 2003, the Superior Court affirmed Mr. Lockhart's judgment of sentence.  (*Id.*)

On November 12, 2003, Mr. Lockhart filed a Petition for Allowance of Appeal *Nunc Pro Tunc*.  On April 13, 2004, the Pennsylvania Supreme Court denied his request.  *See Commonwealth v. Lockhart*, 186 MM 2003 (Pa. Super. Apr. 13,

2004)(unpublished).[6]  However, Mr. Lockhart was subsequently granted permission

to file a Petition for Allowance of Appeal *Nunc Pro Tunc* when the trial court resolved

his petition for collateral relief on January 13, 2005.  (*See* Doc. 24-34, PCRA Order.)

His Petition for Allowance of Appeal raised the following issues:

> 1.  Whether the evidence adduced at trial was insufficient as a matter of law to prove beyond a reasonable doubt that the defendant engaged in any of the conduct that was the subject of the criminal information;

> 2.  Whether the verdict was against the weight of the evidence in that the testimony of the prosecution's key witness, Dontae Chambers, was patently unreliable and contradictory so that any verdict derived therefrom was based on pure conjecture and speculation;

> 3.  Whether the trial court erred in failing to declare a mistrial after it was disclosed that the Commonwealth had failed to provide the defense with exculpatory evidence that someone other than the defendant had been identified by the key prosecution witness, Dontae Chambers, as the murderer, such exculpatory evidence would have changed the defense strategy and failure to grant a mistrial unfairly prejudiced the defendant; and

> 4.  Whether the trial court erred in refusing to allow Dontae Chambers to invoke his constitutional privilege against self-incrimination before the jury and informing them that he had been granted immunity at the Commonwealth's requirement when such evidence would have placed Mr. Chambers' testimony in the proper context for the jury to weigh his testimony and properly evaluate his credibility.

(Doc. 24-31, Mr. Lockhart's Pet. for Allowance of Appeal.)  On August 1, 2005, the

Pennsylvania Supreme Court denied Mr. Lockhart's Petition.  (*See* Doc. 2-6, ECF p.

---

[6]  The court takes judicial notice of the docket sheet in *Commonwealth v. Lockhart*, 186 MM 2003 (Pa. Super. Ct. Apr. 13, 2004), available through Pennsylvania's Unified Judicial Docket System docket research at: http://ujsportal.pacourts.us/.

2, *Commonwealth v. Lockhart*, 584 Pa. 674, 880 A.2d 1237 (Pa. 2005)(Table No. 124 MAL 2005).)  Mr. Lockhart did not seek review in the United States Supreme Court.

### C.    PCRA Proceedings

On October 18, 2004, Mr. Lockhart filed a petition under Pennsylvania's Post Conviction Relief Act (PCRA), 42 PA. CON. STAT. ANN. §§ 9541-9546.  (*See* Doc. 2-4, Br. in Support of Pet.'s PCRA Pet.)  The trial court, now poised as the PCRA court, held a hearing on January 5, 2005, to address Mr. Lockhart's PCRA petition. (*See* Doc. 24-30, PCRA Hr'g Tr.)  Mr. Lockhart, with the assistance of counsel, raised the following claims at his PCRA hearing:

1.    ineffectiveness of trial counsel for failing to perfect his direct appeal petition for allowance of appeal before the Pennsylvania Superior Court (*Id.*, ECF pp. 4-5);

2.    ineffectiveness of trial counsel to conduct a proper cross-examination of Dontae Chambers after he was granted transactional immunity for perjury (*Id.*, ECF pp. 6-8);

3.    ineffectiveness of trial counsel for failing to accept the trial court's offer of a continuance to explore issues surrounding the possibility of Bernard Adams being a possible suspect (*Id.*, ECF pp. 8-11);

4.    prosecutorial misconduct based on the Commonwealth's withholding of Dontae Chambers' statement regarding Bernard Adams (*Id.*, ECF p. 11);

5.    the Commonwealth's lack of probable cause to arrest Mr. Lockhart because the affidavit was based on the perjured testimony of Dontae Chambers (*Id.*, ECF p. 12); and

-18-

6.    the verdict was not supported by sufficient evidence because it was solely based on the perjured testimony of Dontae Chambers (*Id*., ECF pp. 13-14).

On January 13, 2005, in a two paragraph Order, the PCRA Court granted Mr. Lockhart leave to file a Petition for Allowance of Appeal *Nunc Pro Tunc* and denied the remaining PCRA claims.  (*See*  Doc. 24-34, Order Denying PCRA Petition.)

Mr. Lockhart did not appeal the PCRA Court's order to the Pennsylvania Superior Court.  Mr. Lockhart did not file a second PCRA petition following the Pennsylvania Supreme Court's denial of his Petition for Allowance of Appeal in August 2005.  Accordingly, his sentence became final on October 31, 2005.[7]

### D.    Federal Habeas Corpus Proceedings

On June 20, 2006, Mr. Lockhart timely filed the instant petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.[8]  (Doc. 1, Pet.)  He also filed a supporting memorandum of law.  (Doc. 2, Mem. in Supp. Pet. for Writ of Habeas Corpus.)  He raises the following grounds for relief:

---

[7]   Pursuant to the PCRA, collateral actions must be filed within one year of the date the conviction at issue becomes final. 42 Pa. Cons. Stat. § 9545(b)(1).  A judgment becomes final at the conclusion of direct review, including discretionary review in the Supreme Court of Pennsylvania and the Supreme Court of the United States, or at the expiration of time for seeking such review.  42 Pa. Cons. Stat. § 9545(b)(3).  Here, Mr. Lockhart's judgment became final when direct review concluded on November 23, 2005, ninety days after the Pennsylvania Supreme Court denied his petition for allocatur. *See Whitney v. Horn*, 280 F.3d 240, 252 n. 13 (3d Cir. 2002).  Accordingly, Mr. Lockhart had until October 31, 2006, to file a PCRA petition.

[8]   Pursuant to the prisoner mailbox rule, a prisoner's *pro se* petition is deemed filed when delivered to prison officials for mailing.  *See Pabon v. Mahanoy*, 654 F.3d 385, 391 n. 8 (3d Cir. 2011)(citing *Burns v. Morton*, 134 F.3d 109, 113 (3d Cir. 1998)).

1.  The verdict was against the weight of the evidence in that the testimony of the prosecution's key witness, Dontae Chambers, was patently unreliable and contradictory so that any verdict derived therefrom was based on pure conjecture and speculation;

2.  In the absence of any evidence that Mr. Lockhart actively participated in conspiracy to murder, kidnapping, and robbery was insufficient to render Mr. Lockhart guilty of the crime;

3.  Mr. Lockhart averse (sic) that favorable exculpatory evidence that State failed to disclose to defendant would have made a different result "reasonably probable" in a capital murder prosecution, and thus nondisclosure of evidence was a *Brady* violation;

4.  Mr. Lockhart maintains his innocence and seeks an acquittal or new trial because Mr. Lockhart's capital murder conviction violateded (sic) the Due Process Clause of the Fourteenth Amendment, where the State prosecution (Mr. Keating) knowingly used perjured testimony from it's chief witness (Dontae Chambers) during trial to obtain a tainted conviction;

5.  Mr. Lockhart averse (sic) that the Commonwealth's use of preliminary and trial hearing testimony of Dontae Chambers, in light of Commonwealth's witness (Mr. Chambers) invocation of privilege against self-incrimination based upon fear of perjury charges, denied Mr. Lockhart the right to confront and cross-examine his accuser, in violation of the Sixth Amendment to the United States Constitution and Article I § 9 of the Pennsylvania Constitution;

6.  The trial court erred in refusing to allow Dontae Chambers to invoke his constitutional privilege against self-incrimination before the jury and informing them that he had been granted "transational (sic) immunity" for his perjured testimony at the Commonwealth's request, when such evidence would have placed Mr. Chambers' direct testimony in the properly evaluation his credibility; and

7.  The trial court's general instructions on accomplice liability permitted the jury to convict Mr. Lockhart of murder of the

> first degree without proof beyond a reasonable doubt that he possessed the specific intent to kill. All previous counsel were ineffective; trial counsel for failing to object and appellate PCRA counsel for failing to raise and preserve prior counsel's ineffectiveness.

(Doc. 2, ECF pp. 2-3, Pet.'s Mem. in Supp. Habeas Pet.)

In accordance with *United States v. Miller*, 197 F.3d 644 (3d Cir. 1999) and *Mason v. Meyers*, 208 F.3d 414 (3d Cir. 2000), the Court issued formal notice to Mr. Lockhart that he could either have the petition ruled on as filed, that is, as a § 2254 petition for writ of habeas corpus and heard as such, but lose his ability to file a second or successive petition, absent certification by the court of appeals, or withdraw his petition and file one all-inclusive § 2254 petition within the one-year statutory period prescribed by the Antiterrorism Effective Death Penalty Act (AEDPA). (Doc. 4.) On July 17, 2006, Mr. Lockhart returned the notice of election form, indicating that he wished to proceed with his petition for writ of habeas corpus as filed. (Doc. 5.) Thus, a Show Cause Order was issued on July 20, 2006, and then again on September 1, 2006. (Docs. 6 and 10.) On May 18, 2007, the District Attorney of Cumberland County filed a response to the petition. (Docs. 22, 23 and 24.) Mr. Lockhart did not file a traverse.


## III.    Governing Legal Principles

A habeas corpus petition pursuant to § 2254 is the proper mechanism for a prisoner to challenge the "fact or duration" of his confinement. *Preiser v. Rodriguez*, 411 U.S. 475, 498-99, 93 S.Ct. 1827, 1841, 36 L.Ed.2d 439 (1973). As Mr.

Lockhart's conviction became final after 1996, this case is governed by the federal habeas statute applicable to state prisoners, 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104–132, 110 Stat. 1214, April 24, 1996 (AEDPA).  Habeas relief is only available on the grounds that a petitioner's judgment of sentence or confinement violates federal law.  28 U.S.C. § 2254(a); *Wilson v. Corcoran*, ____ U.S. ____, ____, 131 S.Ct. 13, 16, 178 L.Ed.2d 276 (2010)(per curiam).  State law claims are not remediable on federal habeas review, even if state law was erroneously interpreted or applied.  *See Swarthout v. Cooke*, ___, U.S. ____, ____, 131 S.Ct. 859, 861 - 62, 178 L.Ed.2d 732 (2011) (citations omitted); *see also Glenn v. Wynder,* 743 F.3d 402, 407 (3d Cir. 2014)(quoting *Estelle v. McGuire,* 502 U.S. 62, 67 - 68, 112 S.Ct. 475, 480, 116 L.Ed.2d 385 (1991)("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."))

A person in custody pursuant to a judgment of a state court must generally meet three requirements to obtain habeas relief:  (1) exhaustion; (2) lack of a procedural bar; and (3) satisfaction of the deferential standard of review set forth in the AEDPA.

### A.    Exhaustion and Procedural Default

Under 28 U.S.C. § 2254(b)(1)(A), a federal district court may not grant a habeas petition filed on behalf of "a person in custody pursuant to the judgment of a [s]tate court" unless "the applicant has exhausted the remedies available in the

-22-

courts of the [s]tate." 28 U.S.C. § 2254(b)(1)(A);  Harrington v. Richter, ____ U.S. ____, ____, 131 S.Ct. 770, 787, 178 L.Ed.2d 624 (2011).  The exhaustion requirement is grounded on principles of comity to ensure that state courts have the initial opportunity to review federal constitutional challenges to state convictions. Werts v. Vaughn, 228 F.3d 178, 192 (3d Cir. 2000).

A state prisoner exhausts state remedies by giving the "state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process."  O'Sullivan v. Boerckel, 526 U.S. 838, 845, 119 S.Ct. 1728, 1732, 144 L.Ed.2d 1 (1999).  A habeas petitioner retains the burden of showing that all of the claims alleged have been "fairly presented" to the state courts.  To "fairly present" a claim, a petitioner must present its "factual and legal substance to the state courts in a manner that puts them on notice that a federal claim is being asserted."  McCandless v. Vaughn, 172 F.3d 255, 261 (3d Cir.1999).  "[A] state habeas petitioner must present the 'substantial equivalent' of his federal claim to the state courts in order to give the state courts 'an opportunity to apply controlling legal principles to the facts bearing upon his constitutional claim.'"  Collins v. Sec'y of Pa. Dep't of Corr., 742 F.3d 528, 543 (3d Cir. 2014)(quoting Picard v. Connor, 404 U.S. 270, 277 - 78, 92 S.Ct. 509, 513, 30 L.Ed.2d 438 (1971)).

A federal habeas petitioner "shall not be deemed to have exhausted the remedies available in the courts of the State ... if he has the right under the law of the State to raise, by any available procedure, the question presented."  28 U.S.C. §

-23-

2254(c).  The petitioner has the burden of establishing that the exhaustion

requirement has been met.  *Ross v. Petsock*, 868 F.2d 639, 643 (3d Cir. 1989);

*O'Halloran v. Ryan*, 835 F.2d 506, 508 (3d Cir. 1987).

Under the procedural default doctrine, a federal habeas court is precluded

from reaching the merits of a claim when: (1) the claim was presented to the state

courts and was denied on the basis of an adequate and independent state

procedural ground; or (2) the claim was not presented to the state courts and it is

clear those courts would not find the claim procedurally barred under state law.

*Coleman v. Thompson*, 501 U.S. 722, 735 n. 1, 111 S.Ct. 2546, 2557, 115 L.Ed.2d

640 (1991); *Lines v. Larkins*, 208 F.3d 153, 160 (3d Cir. 2000).  Although treated as

technically exhausted, such claims are nonetheless considered procedurally

defaulted.  *Coleman*, 501 U.S. at 735 n. 1, 111 S.Ct. at 2557 n. 1; *Lines v. Larkins*,

208 F.3d at 160 n. 9.

A federal court cannot review the merits of procedurally defaulted claims

unless the petitioner demonstrates either: (1) "cause" for the procedural default and

"actual prejudice" as a result of the alleged violation of federal law; or (2) failure to

consider the claims will result in a "fundamental miscarriage of justice."  *Edwards v.*

*Carpenter*, 529 U.S. 446, 451, 120 S.Ct. 1587, 1591, 146 L.Ed.2d 518 (2000);

*Wenger v. Frank*, 266 F.3d 218, 223-224 (3d Cir. 2001).  To satisfy the first

exception, a petitioner must show: (1) cause for his failure to raise his claim in state

court; and (2) prejudice to his case as a result of that failure.  *Coleman*, 501 U.S. at

750, 111 S.Ct. at 2565.  To demonstrate "cause" for a procedural default, the

petitioner must identify "some objective factor external to the defense" that impeded his ability to raise the claim in state court. *Murray v. Carrier*, 477 U.S. 478, 488, 106 S.Ct. 2639, 2645, 91 L.Ed.2d 397 (1986). Once "cause" has been successfully demonstrated, a petitioner must then prove "prejudice."[9] To establish "prejudice," "the habeas petitioner must show 'not merely that the errors at . . . trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions.'" *Id.* at 494, 106 S.Ct. at 2648 (citing *United States v. Frady*, 456 U.S. 152, 170, 102 S.Ct. 1584, 1596, 71 L.Ed.2d 816 (1982)(emphasis in original)).

Procedural default may also be excused if a petitioner can demonstrate that a fundamental miscarriage of justice will occur, *i.e.* that he is "actually innocent" of the crimes against him. *Bousley v. United States*, 523 U.S. 614, 623, 118 S.Ct. 1604, 1611, 140 L.Ed.2d 828 (1998). A fundamental miscarriage of justice will occur if a petitioner can establish that in light of new evidence it is more likely than not that no reasonable juror would have convicted him absent the claimed error. *Schlup v. Delo*, 513 U.S. 298, 327 - 28, 115 S.Ct. 851, 867, 130 L.Ed.2d 808 (1995). The fundamental miscarriage of justice exception is confined to cases of actual innocence as compared to legal innocence, where the petitioner can show that it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt in light of new evidence. *See McQuiggin v. Perkins*, ___ U.S. ___,

---

[9] If a petitioner fails to show cause for his procedural default, it is unnecessary for the court to reach the prejudice issue. *See Smith v. Murray*, 477 U.S. 527, 533, 106 S.Ct. 2661, 2666, 91 L.Ed.2d 434 (1986).

\_\_\_\_, 133 S.Ct. 1924, 1931-32, 185 L.Ed.2d 1019 (2013).  "[A] petitioner asserting actual innocence . . . must rely on 'reliable evidence - whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence'" not presented at trial.  *Munchinski v. Wilson*, 694 F.3d 308, 337-38 (3d Cir. 2012)(citing *Schlup*, 513 U.S. at 324, 115 S.Ct. at 865).  New evidence which tends to undermine the credibility of a witness "will seldom, if ever, make a clear and convincing showing that no reasonable juror would have believed the heart of [the witness'] account of petitioner's actions.  *Sawyer v. Whitley*, 505 U.S. 333, 349, 112 S.Ct. 2514, 2524, 120 L.Ed.2d 269 (1992).

The United States Court of Appeals for the Third Circuit has instructed that a petition containing exhausted and unexhausted but procedurally barred claims is not a mixed petition requiring dismissal under *Rose v. Lundy*, 455 U.S. 509, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982).  *See Wenger*, 266 F.3d at 227-28.  Instead, the Third Circuit Court of Appeals held that the district court should review the merits of the exhausted claims, but must not decide the merits of the claims that are barred under the procedural default doctrine.  *Id.*   In addition, a district court has the discretion to consider a state prisoner's unexhausted claim and deny it on the merits "if it is perfectly clear that the applicant does not raise even a colorable federal claim." *Granberry v. Greer*, 481 U.S. 129, 135, 107 S.Ct. 1671, 1675, 95 L.Ed.2d 119 (1987).

### B.      Standard of Review

The AEDPA specifies that the standard of review applicable to a particular

claim depends on how that claim was resolved by the state courts.  *Breakiron v.*

*Horn*, 642 F.3d 126, 131-32 (3d Cir. 2011).   If an exhausted claim has not been

adjudicated by the state courts, then *de novo* review applies.  *Id.* at 131 (citing

*Porter v. McCollum*, 558 U.S. 30, 39, 130 S.Ct. 447, 452, 175 L.Ed.2d 398 (2009)).

If, however, the state court's highest court adjudicated a federal habeas claim on the

merits, rather than on a procedural or some other ground, the federal court must

review the claim under the deferential standard contained in 28 U.S.C. § 2254(d);

*see Appel v. Horn*, 250 F.3d 203, 210 (3d Cir. 2001).[10]   Pursuant to 28 U.S.C. §

2254(d), federal habeas relief may only be granted if the state court's decision "was

---

[10]  "An 'adjudication on the merits' has a well settled meaning: a decision finally resolving the parties' claims, with *res judicata* effect, that is based on the substance of the claim advanced, rather than on a procedural, or other, ground*." Rompilla v. Horn*, 355 F.3d 233, 247 (3d Cir. 2004), *rev'd on other grounds*, *Rompilla v. Horn*, 545 U.S. 374, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005).  Further, an "adjudication of the merits" can occur at any level of state court.  *Thomas v. Horn*, 570 F.3d 105, 115 (3d Cir. 2009).

The differential standard of 28 U.S.C § 2254(d) applies even "when a state court's order is unaccompanied by an opinion explaining the reasons relief has been denied"; as explained by the Supreme Court, "it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."  *Richter,* ____ U.S. at ____, 131 S.Ct. at 784-85.  Likewise, if a petition has presented the claims raised in a federal habeas application to a state court, and the state court opinion addresses some but not all of those claims, the federal habeas court must presume (subject to rebuttal) that the state court adjudicated the unaddressed federal claims on the merits.  *Johnson v. Williams*, ____ U.S. ____, ____, 133 S.Ct. 1088, 1095-96, 185 L.Ed.2d 105 (2013).  The consequence of this presumption is that the federal habeas court will now review the previously unaddressed (but clearly presented) claim under § 2254(d) whereas, in the past, federal habeas courts often assumed "that the state court simply overlooked the federal claim[s] and proceed[ed] to adjudicate the claim[s] de novo."  *Id.* at ____, 133 S.Ct. at 1091-92.

contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(2).  In short, section 2254(d)(1) governs federal court review of the state court's legal conclusions while section 2254(d)(2) governs review of factual findings. The AEDPA places the burden on the petitioner to make this showing.  *Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).

The "contrary to" and "unreasonable application" clauses of Section 2254(d)(1) have independent meaning.  *Bell v. Cone*, 535 U.S. 685, 694, 122 S.Ct. 1843, 1850, 152 L.Ed.2d 914 (2002).  A federal court may grant habeas relief under the "contrary to" clause of § 2254(d)(1) if a state court either "applies a rule that contradicts the governing law set forth in [the United States Supreme Court's] cases" or "confronts a set of facts that are materially indistinguishable from a decision of [the] Court and nevertheless arrives at a result different from [the Court's] precedent."  *Early v. Packer*, 537 U.S. 3, 8, 123 S.Ct. 362, 365, 154 L.Ed.2d 263 (2002); *see also Williams*, 529 U.S. at 405 - 406, 120 S.Ct. at 1519 - 1520 (distinguishing the "contrary to" and the "unreasonable application" standards); *see also Grant v. Lockett*, 709 F.3d 224, 231 (3d Cir. 2013).

A federal court may also grant habeas relief under the "unreasonable application" clause of § 2254(d)(1) if the state court "identifies the correct governing

legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." *Williams*, 529 U.S. at 407, 120 S.Ct. at 1520.  Alternatively, an "unreasonable application" of federal law occurs if the state court chose the correct rule of law based on the facts, but applied the rule in an "objectively unreasonable way." *Id*.; *see also Rompilla v. Beard*, 545 U.S. 374, 380, 125 S.Ct. 2456, 2462, 162 L.Ed.2d 360 (2005).

"[R]eview under 28 U.S.C. § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, ____ U.S. ____, ____,  131 S.Ct. 1388, 1398, 179 L.Ed.2d 557 (2011); *see also Rapelje v. McClellan*, ____ U.S. ____, ____, 134 S.Ct. 399, 400, 187 L.Ed.2d 442 (2013).  For purposes of § 2254(d)(1), "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 528 U.S. at 411, 120 S.Ct. at 1522.  Rather,

> an "unreasonable application of" [Supreme Court] holdings must be " 'objectively unreasonable,' " not merely wrong; even "clear error" will not suffice. *Lockyer v. Andrade*, 538 U.S. 63, 75–76, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003). Rather, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. ____, ____, 131 S.Ct. 770, 786–787, 178 L.Ed.2d 624 (2011).

*White v. Woodall*, ____ U.S. ____, ____, 134 S.Ct. 1697, 1702, 188 L.Ed.2d 698 (2014).  "If this standard is difficult to meet, that is because it was meant to be."

*Richter*, ____ U.S. at ____, 131 S.Ct. at 786.

Turning to § 2254(d)(2), the test for the "unreasonable determination of facts" clause is whether the petitioner has demonstrated by "clear and convincing evidence," § 2254(e)(1), that the state court's determination of the facts was unreasonable in light of the record.  *Rountree v. Balicki*, 640 F.3d 530, 537 (3d Cir. 2011) (citing *Rice v. Collins*, 546 U.S. 333, 338–339, 126 S.Ct. 969, 974, 163 L.Ed.2d 824 (2006) ("State-court factual findings, moreover, are presumed correct; the petitioner has the burden of rebutting the presumption by 'clear and convincing evidence.' ") (quoting § 2254(e)(1)) (citing *Miller–El v. Dretke*, 545 U.S. 231, 240, 125 S.Ct. 2317, 2325, 162 L.Ed.2d 196 (2005)); *see also Simmons v. Beard*, 590 F.3d 223, 231 (3d. Cir. 2009) ("Under the § 2254 standard, a district court is bound to presume that the state court's factual findings are correct, with the burden on the petitioner to rebut those findings by clear and convincing evidence.").  Further, as with § 2254(d)(1), the evidence against which a federal court measures the reasonableness of the state court's factual findings is the record evidence at the time of the state court's adjudication.  *Rountree*, 640 F.3d at 538 (citing *Cullen*, ____ U.S. at  ____, 131 S.Ct. at 1401-03).

The Third Circuit has developed a two-step inquiry for reviewing a § 2254 petition.  As noted above, the court must first identify the applicable Supreme Court precedent.  *Outten v. Kearney*, 464 F.3d 401, 413 (3d Cir. 2006).  The petitioner must show that the Supreme Court precedent requires the opposite result, not merely that his interpretation is more plausible than that of the state court.  *Id.*

Second, the federal habeas court must objectively evaluate whether the state court decision was an unreasonable application of Supreme Court precedent. *Id*., 464 F.3d at 414 (citing *Werts v. Vaughn*, 228 F.3d 178 (3d Cir. 2000)). The district court cannot grant relief simply because "we disagree with the state court's decision or because we would have reached a different result." *Id*. The court may only grant relief if "the state court decision, evaluated objectively and on the merits, resulted in an outcome that cannot reasonably be justified under existing Supreme Court precedent." *Id*. (quoting *Hackett v. Price*, 381 F.3d 281, 287 (3d Cir. 2004)).

Finally, "[i]n considering a § 2254 petition, we review the 'last reasoned decision' of the state courts on the petitioner's claims." *Simmons v. Beard*, 590 F.3d 233, 232 (3d Cir. 2009)(quoting *Bond v. Beard*, 539 F.3d 256, 289-90 (3d Cir. 2008).)

## IV.   Discussion

### A.   Procedurally Defaulted Claims.

Claims 4, 5 and 7 of the Petition are based on the trial record and were not presented in Mr. Lockhart's direct appeal in the state system. Additionally, the court notes that any claims raised in Mr. Lockhart's PCRA petition are unexhausted as the Pennsylvania courts did not have "one full opportunity to resolve" them during "one complete round of the State's established appellate review process." *See O'Sullivan*, 526 U.S. at 844-45; *see Wenger*, 266 F.3d at 223. This is because Mr. Lockhart did not appeal the PCRA court's order which denied all claims except for

his request to file a Petition for Allowance of Appeal *Nunc Pro Tunc* of the Superior Court of Pennsylvania's order denying his direct appeal.  (*See* Doc. 24-34, Order.) Thus, these claims were never fairly presented to the state court for review.  As Mr. Lockhart is no longer able to raise these claims before the state court, either by means of a direct or collateral appeal, they are technically exhausted but procedurally defaulted.  This means that the court cannot review the merits of these claims absent a showing of cause and prejudice, or a miscarriage of justice.

In Claim 4, Mr. Lockhart alleges that the prosecutor knowingly used the perjured and unreliable testimony of Dontae Chambers to convict him.  (Doc. 2, ECF pp. 39-49, Pet.'s Mem. in Supp. Habeas Pet.)  As such, Mr. Lockhart argues that his "conviction is a product of miscarriage of justice."  (Doc. 2, ECF p. 49.)  He claims "[t]he Prosecution knowingly used perjured testimony to convict an innocent man ... [t]he jury was presented with two conflicting arguments.  (Perjury and recantation)." (*Id.*)  Mr. Lockhart states that he raised this claim in his PCRA petition.  (Doc. 1, Pet., ECF pp. 9-10.)  At the PCRA hearing, Mr. Lockhart claimed the prosecution used the perjured testimony of Dontae Chambers to convict him.  (Doc. 24-30, ECF p. 12, pp. 14-15, p. 37.)  As noted above, Mr. Lockhart did not appeal the PCRA court's denial of his petition based on this claim, thus the claim is procedurally defaulted.

To the extent Mr. Lockhart asserts he was convicted on Mr. Chambers' false testimony, this claim falls short of showing innocence sufficient to allow consideration of his procedurally barred claim.  Petitioners asserting innocence as a gateway to defaulted claims must establish that, in light of new evidence, "it is more

likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Schulp*, 513 U.S. at 327, 115 S.Ct. at 867.  The fact that the jury was confronted with two conflicting accounts of the murder by Mr. Chambers is not new evidence.  It was evidence presented and argued at trial by all counsel.  (Doc. 24-27, ECF pp. 14-19; *Id.*, ECF pp. 35-49; Doc. 24-30, ECF pp. 29-30.)  The jury, hearing the inconsistent statements, was free to believe or disregard any or all of Mr. Chambers' testimony.  The fact that the jury heard Mr. Chambers' recantation of his earlier testimony which incriminated Mr. Lockhart in the death of Sydney Bull and still convicted him of murder and other related offenses does not suggest that reasonable jurors, if made aware of the perjured testimony, would not have convicted him.  In sum, Mr. Lockhart's claim that the prosecution presented false evidence is procedurally defaulted.  He proffers no new evidence to establish his actual innocence of the crimes for which he was convicted.  Accordingly, the court concludes that Mr. Lockhart has not met the standard under the actual innocence doctrine to excuse his procedural default of this claim.

With respect to Claim 5, Mr. Lockhart asserts that he was denied the opportunity to confront his accuser Dontae Chambers after he invoked his Sixth Amendment right against self incrimination.  (Doc. 2, ECF pp. 50-54, Pet.'s Mem. in Supp. Habeas Pet.)  Mr. Lockhart did not assert a Confrontation Claim in his direct appeal or his PCRA petition.  While bearing some resemblance to an ineffective assistance of counsel claim he raised at his PCRA claim, these claims are not the

same and thus Claim 5 is procedurally defaulted.[11]  (*See* Doc. 24-30, PCRA Hearing

Tr., ECF pp. 6 - 9; *see also Rose v. Palmateer*, 395 F.3d 1108, 1111–12 (2005)

("Here, although Rose's Fifth Amendment claim is related to his claim of ineffective

assistance, he did not fairly present the Fifth Amendment claim to the state courts

when he merely discussed it as one of several issues which were handled

ineffectively by his trial and appellate counsel.  While admittedly related, they are

distinct claims with separate elements of proof, and each claim should have been

separately and specifically presented to the state courts.").)  Without a showing of

cause and prejudice, or a miscarriage of justice, Mr. Lockhart has failed to overcome

the procedural default of this claim.  Mr. Lockhart does not allege that, and the court

does not discern, any external impediment prevented him from raising this particular

claim at his PCRA hearing or properly exhausting claims raised in his PCRA petition.

In the absence of cause, the court need not address the issue of prejudice.

Additionally, Mr. Lockhart has not provided new reliable evidence of his actual

innocence, thereby precluding the court from reviewing this claim under the

miscarriage of justice exception to the procedural default doctrine.  Claim 5 is

---

[11]  At his PCRA hearing, Mr. Lockhart presented an ineffectiveness of counsel claim based on his trial counsel's alleged failure to properly conduct a cross-examination of Mr. Chambers.

> THE COURT: So you're saying you're not happy with the job that your attorney did cross-examining Mr. Chambers after he took the Fifth Amendment?
>
> THE WITNESS: Yes.

(*Id.*, ECF pp. 8-9.)  Importantly, Mr. Lockhart specifically indicated that he was not asserting a claim that the trial court committed any error, or otherwise prohibited his counsel from conducting a cross-examination of Mr. Chambers.  (*Id.*, ECF p. 8.)

procedurally defaulted.

Notably, even if this claim was not procedurally defaulted, it would prove unavailing on the merits.  The Sixth Amendment's Confrontation Clause guarantees that, "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him."  U.S. CONST. amend. VI.  "The Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Van Arsdall*, 475 U.S. 673, 679. 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986)(quoting *Delaware v. Fensterer*, 474 U.S. 15, 20, 106 S.Ct. 292, 295, 88 L.Ed.2d 15 (1985)(emphasis in original)); *see also U.S. v. Lore*, 430 F.3d 190 (3d Cir. 2005).  In this instance, during his cross-examination by Mr. Norris' counsel, Mr. Chambers sought to speak with his legal counsel.  The trial court dismissed the jury and Mr. Chambers advised the court he wished to invoke his Fifth Amendment right.  (*See* Doc. 24-5, ECF pp. 41-42.)  At that point, the trial court identified two concerns: (1) whether Mr. Chambers could invoke the Fifth Amendment after testifying on direct examination, and the cross-examination of Mr. Norris' defense counsel; and (2) "[h]ow do we handle the problem of the defense, particularly Mr. Lockhart not being able to cross-examine" Mr. Chambers if he did not testify further.  (*Id*., ECF pp. 43 and 46-47.)  After answering the first question in the affirmative, the second issue was resolved after the Commonwealth granted Mr. Chambers transactional immunity for any perjured testimony he had provided up to that point.  Once given this immunity, Mr. Chambers agreed to continue testifying.

-35-

(*Id.*, ECF pp. 52-56.)  When the trial resumed, Mr. Chambers was cross-examined

by co-defendant Mr. Norris' counsel, and then Mr. Lockhart's counsel.  (*Id.*, ECF p.

56-84.)  After re-direct, counsel for both defendants declined the opportunity to

question Mr. Chambers further.  Based on the above, it is clear that the trial judge

was well aware of Mr. Lockhart's right to cross-examine Mr. Chambers, whose

examination was completed, without constraints.  As such, Claim 5, previously

determined procedurally defaulted, is also without merit.

Turning to Claim 7, Mr. Lockhart argues trial counsel, and his PCRA counsel,

were ineffective for failing to object to the trial court's jury instruction on accomplice

liability, which he claims relieved the Commonwealth of the burden of proving the

requisite specific intent for first degree murder.  (Doc. 2, ECF pp. 50-54, Pet.'s Mem.

in Supp. Habeas Pet.)  Mr. Lockhart concedes that this issue was never raised at

trial, on direct appeal, or in his collateral appeal, thus he has failed to exhaust the

state court remedies on this issue.  However, procedural default of this claim may be

excused if his PCRA counsel's failure to raise this claim itself constitutes

ineffectiveness of counsel.  *See Martinez v. Ryan*, ____ U.S. ____, 132 S.Ct. 1309,

182 L.Ed.2d 1309 (2012).

Relying on *Laird v. Horn*, 414 F.3d 419 (3d Cir. 2005), Mr. Lockhart argues

that the trial court's general accomplice liability instruction to the jury erroneously

permitted the jury to find him guilty without proof beyond a reasonable doubt of all

the elements of first-degree murder as required under Pennsylvania law.[12]  (Doc. 2, ECF pp. 60-62.)  Here, Mr. Lockhart cannot succeed on his ineffectiveness claims of PCRA or trial counsel regarding the jury instruction because there is no merit to the underlying allegation concerning the jury instruction.

The failure of PCRA counsel to raise an ineffective assistance of trial counsel claim may constitute "cause" if (1) PCRA counsel's failure itself constitutes ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) and (2) the underlying ineffective assistance of trial counsel claim is "a substantial one," *i.e.*, that the claim has some merit. *Martinez,* ____ U.S. at ____, 132 S.Ct. at 1318-19.

To prove ineffective assistance of counsel under *Strickland, supra,* Mr. Lockhart must demonstrate that his trial attorney's performance was deficient, in that it fell below an objective standard of reasonableness, and that he suffered prejudice as a result of trial counsel's deficient performance. *Strickland*, 466 U.S at 687-88, 104 S.Ct. at 2064.  To demonstrate prejudice, "a defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. at 2068. Petitioner bears the burden of establishing both components. *Id.* at 687, 104 S.Ct. at 2064.

---

[12]  "Under Pennsylvania law, first-degree murder requires the specific intent to kill, second-degree murder is a killing that occurs during the course of a felony, and 'all other kinds of murder' constitute third-degree murder.  18 Pa. C.S.A. § 2502." *Laird*, 414 F.3d at 422 n. 3.

> "In a criminal trial, the State must prove every element of the offense, and a jury instruction violates due process if it fails to give effect to that requirement." *Middleton v. McNeil*, 541 U.S. 433, 437, 124 S.Ct. 1830, 158 L.Ed.2d 701 (2004). An instruction violates due process when "the instruction contains some ambiguity, inconsistency, or deficiency," and "there was a reasonable likelihood that the jury applied the instruction in a way that relieved the State of its burden of proving every element of the crime beyond a reasonable doubt." *Williams v. Beard*, 637 F.3d 195, 223 (3d Cir. 2011)(internal quotation marks omitted).

*Boettlin v. Smeals*, 523 F. App'x 867, 869-70 (3d Cir. 2013).

In Pennsylvania, "[a] criminal homicide constitutes murder of the first degree when it is committed by an intentional killing." 18 PA. CONS. STAT. § 2502. "Intentional killing," is defined as "[k]illing by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing." *Id.* "[A] jury charge that relieves the prosecution of the need to prove specific intent to kill in a first degree murder case is impermissible." *Laird*, 159 F.Supp.2d at 81.

In order to obtain a conviction for first-degree murder, the Commonwealth must establish that a human being was unlawfully killed; the defendant perpetrated the killing; and the defendant acted with malice and a specific intent to kill. *Commonwealth v. Murray*, 83 A.3d 137, 151 (Pa. 2013). "The Commonwealth may prove the specific intent to kill necessary for first degree murder wholly through circumstantial evidence." (*Id.*) A defendant may also be convicted for first-degree murder as an accomplice. *Commonwealth v. Markman*, 591 Pa. 249, 916 A.2d 586, 597 (2007).

> To that end, "the jury may convict the defendant as an accomplice so long as the facts adequately support the

-38-

conclusion that he or she aided, agreed to aid, or attempted to aid the principal in planning or committing the offense, and acted with the intention to promote or facilitate the offense." *Commonwealth v. Markman*, 591 Pa. 249, 916 A.3d 586, 597 (2007). The amount of aid may be insubstantial, so long as such aid was offered to the principle as assistance in committing the crime. *Id.* at 597-98. Nevertheless, "simply knowing about the crime or being present at the scene is not enough." *Id.* at 598. Rather, and specific to first degree murder, the evidence must prove that the defendant "possessed the actual requisite specific intent to kill, even if [the jury] determined that he was not the person who actually pulled the trigger." *Commonwealth v. Johnson, R.*, 572 Pa. 283, 815 A.2d 563, 580 (2002).

*Murray*, 83 A.3d at 151.

The trial court made the following statements during the jury charge in Mr. Lockhart's case:

The first thing I want to tell you is that we have two defendants here. You must evaluate the evidence and the charges separately with regard to each Defendant. You must look at the charges and the evidence as though each Defendant is on trial separately.

(Doc. 24-27, ECF pp. 91-92.)

[I]t is the Commonwealth that always has the burden of proving each and every element of the crimes charged beyond a reasonable doubt.

(*Id.*, ECF p. 92.)

[Y]ou may not find the Defendant guilty based upon a mere suspicion of guilt.

(*Id.*, ECF p. 93.) When differentiating the elements of guilt of first degree and third degree murder, the trial court again reviewed the elements of first degree murder, including the requirement of specific intent.

-39-

First-degree murder has four elements to it, basically, and the Commonwealth must prove each and every one of those elements beyond a reasonable doubt before the Defendant can be convicted: one, that Sydney Bull is dead; two, that the Defendant killed him either personally or as an accomplice – – and I'll talk about accomplice liability in a minute; three, that he did so with the specific intent to kill; and four, with malice. Now, a person has specific intent to kill if he has a fully formed intent to kill and is conscious of that intent to kill. So you kill someone intentionally and you're conscious that you intend to kill somebody.

. . .

[A] killing with specific intent to kill is willful, deliberate and premeditated. The specific intent to kill including the premedication (sic) needed for first-degree murder, does not require planning or previous thought of any particular length of time. It can occur quickly. All that is necessary is that there be time enough so that the Defendant can and does fully form an intent to kill and be conscious of that intent to kill. When deciding whether the Defendant had the specific intent to kill, you should consider all of the evidence regarding his words and conduct and the attending circumstances that may show his state of mind.

. . .

So the four elements of first-degree murder are, Sydney Bull is dead; the Defendant killed him, either as the perpetrator or an accomplice; and the Defendant did so with the specific intent to kill him and with malice.

(Doc. 24-28, ECF pp. 14-15.)

First-degree murder, four elements: Sydney Bull is dead, the Defendant killed Sydney Bull, he had the specific intent to kill him, and he did so with malice. Third-degree murder. Sydney Bull is dead, the Defendant killed him, and did so with malice. But that specific intent, the intent that is formed, the premeditation that is there, the intent that is formed and the Defendant being conscious of that intent is missing in third-degree murder. That's the difference.

> Before I leave that, let me tell you about liability for an accomplice, because the Defendant can be guilty of first-or third-degree murder, as he can for any of these crimes, either as the principal or as an accomplice.  You may find the Defendant guilty of a crime without finding that he personally engaged in the conduct required for the commission of that crime if he is an accomplice.  A Defendant is guilty of a crime if he is an accomplice with another person that commits the crime.
>
> A Defendant does not become an accomplice merely by being present at the scene or knowing about the crime.  He is accomplice if, with the intent of promoting or facilitating the commission of the crime, he aids the other person in planning or committing it.  You may find the Defendant guilty of a crime on a theory that he was an accomplice as long as you are satisfied beyond a reasonable doubt that the crime was committed and that the Defendant was an accomplice of the person who committed the crime.  That applies for all of these crimes, first-degree murder, third-degree murder, robbery, arson and kidnapping that I'm going to go over.  That accomplice theory applies to all of them.

(*Id.*, ECF pp. 16-17.)  Finally, the trial judge reminded the jury that they were the ultimate fact finders in this matter.

> I am not, however, the judge of the facts.  It is not for me to decide what are the true facts concerning the charges against the Defendant.  You, the jurors, are the sole judges of the facts.  It will be your responsibility to consider the evidence, to find the facts, and apply the law to the facts as you find them to decide whether the Defendant has been proven guilty beyond a reasonable doubt.

(*Id.*, ECF pp. 27-28.)

Habeas corpus relief is not warranted as to this claim.  The trial court's jury charge as to accomplice liability was not faulty as it did not remove, or alter, the prosecution's obligation to prove beyond a reasonable doubt that Mr. Lockhart, at some point, formulated the requisite specific intent to kill Sydney Bull, allowing the

jury to find him guilty of first-degree murder.  First, it is worth noting that the trial

court broke down first-degree murder into four clear elements and then repeated

this definition to the jury multiple times.  In each instance, the court told the jury that

all four elements, including specific intent, were required to return a first-degree

murder verdict.  The court reviewed the elements of first-degree murder again when

pointing out the difference between it and third-degree murder, further underscoring

the necessity of finding the Defendant formulated specific intent to kill in order to

convict him of first-degree murder.  Moreover, when defining the elements of first-

degree murder, the trial court stressed to the jury that the elements of first degree

murder did not change dependent on whether "the Defendant killed [Sydney Bull]

either personally or as an accomplice;" in either scenario, specific intent was

required in order to convict each Defendant of first-degree murder.  (Doc. 24-28,

ECF pp. 14-16). The requirement of finding specific intent as to each Defendant,

regardless of whether they were personally responsible for pulling the trigger ending

Mr. Bull's life,  or acting as an accomplice, was again stressed by the court when

discussing accomplice liability.  The trial court stressed to the jurors that they could

only hold a Defendant responsible as an accomplice to any of the crimes charged if

they were satisfied beyond a reasonable doubt that the underlying crime was

committed.  Finally, while the jury returned to the court with several questions, they

never sought further guidance or clarification from the trial court as to the varying

degrees of homicide following the initial charge.[13]   There is no suggestion that there was a reasonable likelihood that the jury applied the accomplice liability instruction with respect to the first-degree murder charge in a manner that relieved the Commonwealth of its burden of proving every element of the crime beyond a reasonable doubt, including proving Mr. Lockhart formed the requisite specific intent to kill Sydney Bull.   The jury's verdict was unanimous.   The jury when polled verified the unanimity of each charge of guilt, including first-degree murder.   Because Mr. Lockhart has not shown such a reasonable likelihood that the jury applied the accomplice liability instruction in a way that relieved the Commonwealth of its burden of proving every element of the crime of first-degree murder beyond a reasonable doubt, his trial counsel, and subsequently his PCRA counsel, was not ineffective for failing to object to the charge.   As such, he has not presented facts to demonstrate a substantial claim of ineffectiveness of PCRA counsel to overcome his procedural default of this claim.   Habeas relief on this claim will be denied.

### B.      Merits Review of Properly Exhausted Claims.

### 1.      Mr. Lockhart's Weight of the Evidence Claim is Not Cognizable on Habeas Review.

Mr. Lockhart claims the jury's verdicts were against the weight of the evidence.  (Doc. 1, Pet., ECF p. 5.)  The crux of Mr. Lockhart's argument is that the verdicts rest chiefly on the testimony of Dontae Chambers, "whose testimony was

---

[13]   The law presumes that juries follow their instructions.   *Weeks v. Angelone*, 528 U.S. 225, 234, 120 S.Ct. 727, 733, 145 L.Ed.2d 727 (2000).

patently unreliable and repeatedly contradictory." (Doc. 2, Mem. in Supp. Habeas

Pet., ECF p. 23.)  This claim was addressed by the Pennsylvania Superior Court on

the merits in relation to Mr. Lockhart's direct appeal. (*See* 24-32, *Commonwealth v.*

*Lockhart*, 839 A.2d 1157 (Pa. Super. Oct. 7, 2003)(Table, No. 484 MDA

2002)(unpublished op.)).)

A federal court does not have the authority to grant habeas corpus relief

because it finds that the state conviction is against the "weight" of the evidence. By

definition, a claim that the verdict is against the weight of the evidence requires the

reviewing court to reassess the credibility of the evidence presented at trial. Federal

habeas courts are prevented from conducting such credibility reassessment. *See*

*Marshall v. Lonberger*, 459 U.S. 422, 434-35, 103 S.Ct. 843, 851, 74 L.Ed.2d 646

(1983) (federal courts are not permitted "to redetermine [the] credibility of witnesses

whose demeanor has been observed [only] by the state trial court"); *see also Tibbs*

*v. Florida*, 457 U.S. 31, 37–45, 102 S.Ct. 2211, 2215-2220, 72 L.Ed.2d 652 (1982)

(weight of evidence claims raise questions of credibility); *see also* 28 U.S.C. §

2254(e)(1).  Accordingly, Mr. Lockhart's claim that his conviction was against the

weight of the evidence is non-cognizable in a federal habeas corpus case and is

denied.

### 2.    Sufficiency of the Evidence Claim.

Mr. Lockhart argues that the evidence was insufficient to sustain his

convictions. (Doc. 1, Pet, ECF p. 6; Doc. 2, ECF pp. 23-27.)  In his Petition, he

challenges his individual convictions of conspiracy to murder, kidnapping and robbery.  However, he did not pursue this same issue on direct appeal or in his PCRA petition as he suggests.[14]  (*See* Doc. 2, ECF p. 7.)  Thus, the first question is whether this claim was "fairly presented" to the state courts.  *See Picard*, 404 U.S. at 275, 92 S.Ct. at 512.  As verified from the Superior Court's opinion addressing Mr. Lockhart's sufficiency of the evidence claim presented on direct appeal, the legal theory and facts defining his federal claim are not the same as the claim presented to the state court.  The claims pursued on direct appeal were more general.

> The trial court has opined that [Mr. Lockhart] does not claim the Commonwealth failed to adduce evidence sufficient to make out the elements of the crimes charged against him. Trial Court Opinion, 5/24/02, at 2.  Rather, [Mr. Lockhart] contends that his actual involvement with the crimes was not proved beyond a reasonable doubt on the grounds that the testimony of Dontae Chambers allegedly was defective as a matter of law.  *Id*. at 2-3.  We agree with the trial court's assessment of this claim.

(Doc. 24-32, ECF p. 5.)[15]  Given that Mr. Lockhart exhausted this more generalized

---

[14]  As noted earlier, any claim raised in Mr. Lockhart's PCRA petition is procedurally defaulted as he failed to appeal the PCRA court's order, or file a second PCRA petition.

[15]  The trial court defined Mr. Lockhart's sufficiency of the evidence challenge as such:

> The defendant did not suggest that the elements of first degree murder, or the various other crimes for which he was convicted, had not been proven in connection with the killing of Sydney Bull. Rather, he contended that his involvement has not been proven beyond a reasonable doubt.  He argued that without the testimony of erstwhile eyewitness Dontae Chambers (hereinafter "Chambers") the evidence was insufficient as a matter of law to prove his participation in the crime.

(Doc. 24-33, ECF pp. 2-3.)

claim via his direct appeal efforts, this is the confines of which his federal habeas sufficiency of the evidence claim is also defined.

The Third Circuit Court of Appeals has held that the test for insufficiency of evidence is the same under both Pennsylvania and federal law.  *See Evans v. Court of Common Pleas, Delaware Cnty, Pennsylvania*, 959 F.2d 1227, 1232-1233 and n. 6 (3d Cir. 1992).

Principles of due process dictate that a person can be convicted of a crime only by proof of every element of the charged offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 316, 99 S.Ct. 2781, 2787, 61 L.Ed.2d 560 (1979); *In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 1072, 25 L.Ed.2d 368 (1970); *United States v. Ozcelik*, 527 F.3d 88, 93 (3d Cir. 2008).  In reviewing challenges to the sufficiency of the evidence, a court must determine "whether, after reviewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319, 99 S.Ct. at 2789 (emphasis in original).  Moreover, when the factual record supports conflicting inferences, the federal court must presume, even if it does not affirmatively appear on the record, that the trier of fact resolved any such conflicts in favor of the prosecution, and the court must defer to that resolution.  *Id.*, 443 U.S. at 326, 99 S.Ct. at 2793.  Reviewing federal district courts are to refer to the substantive elements of the criminal offense as defined by state law and must look to state law to determine what evidence is necessary to convict on the crime charged.  *Id.*, 443 U.S. at 324, 99 S.Ct. at 2792.  For a federal habeas

-46-

court reviewing the sufficiency of evidence for a state court conviction, "the only question under *Jackson* is whether that finding was so insupportable as to fall below the threshold of bare rationality." *Coleman v. Johnson,* ____ U.S. ____, ____, 132 S.Ct. 2060, 2065, 182 L.Ed.2d 987 (2012). "The burden on a defendant who raises a challenge to the sufficiency of the evidence is extremely high." *United States v. Iglesias*, 535 F.3d 150, 155 (3d Cir. 2008) (internal quotation marks omitted). Finally, on habeas review, a federal court does not reweigh the evidence or redetermine the credibility of the witnesses whose demeanor was observed at trial. *Marshall v. Lonberger*, 459 U.S. 422, 434, 103 S.Ct. 843, 851, 74 L.Ed.2d 646 (1983).

Here, it is clear from the record that the trial court employed the *Jackson* standard in deciding the insufficiency issues raised in Mr. Lockhart's direct appeal:

> In reviewing the sufficiency of the evidence, we must determine whether the evidence, and all reasonable inferences deducible from that, viewed in the light most favorable to the Commonwealth as a verdict winner, are sufficient to establish all the elements of the offenses beyond a reasonable doubt. *Commonwealth v. Johnson*, 556 Pa. 216, 223, 727 A.2d 1089, 1092 (1999), *cert. denied*, 528 U.S. 1163 (2000). *Accord Commonwealth v. Hagan*, 539 Pa. 609, 613, 654 A.2d 541, 543 (1995).
>
> The Superior Court may not weigh the evidence and substitute our judgment for that of the finder of fact. *Commonwealth v. Vetrini*, 734 A.2d 404, 407 (Pa. Super. 1999). Furthermore, the Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. *Commonwealth v. Harper*, 485 Pa. 572, 576, 403 A.2d 536, 538 (1979); *Commonwealth v. Dellavecchia*, 725 A.2d 186, 188 (Pa. Super. 1998)(*en banc*). The trier of fact, in passing upon the credibility of witnesses and the

weight of the evidence produced, is free to believe all, part, or none of the evidence presented. *Commonwealth v. Valette*, 531 Pa. 384, 388, 613 A.2d 548, 549 (1992); *Vetrini, supra*.

The facts and circumstances established by the Commonwealth need not be absolutely incompatible with a defendant's innocence, but the question of any doubt is for the factfinder unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact can be drawn from the combined circumstances. *Commonwealth v. Seibert*, 622 A.2d 361, 363 (Pa. Super. 1993). A mere conflict in the testimony of the witnesses does not render evidence insufficient because it is within the province of the factfinder to determine the weight to be given to the testimony and whether to believe all, part, or none of the evidence adduced. *Commonwealth v. Baskerville*, 681 A.2d 195, 199 (Pa. Super. 1996). If the fact finder reasonably could have determined from the evidence adduced that all necessary elements of the crime were established, then that evidence will be deemed sufficient to support the verdict. *Commonwealth v. Wood*, 637 A.2d 1335, 1343 (Pa. Super. 1994).

The proper application of this standard requires us to evaluate the entire trial record in the aggregate and not fragments isolated from the totality of the evidence. *Harper*, 485 Pa. at 576 403 A.2d at 538. We do not review a diminished record. *Commonwealth v. Palmer*, 751 A.2d 223, 227 (Pa. Super. 2000). Rather, the law is clear that we are required to consider all evidence that actually was received, without consideration as to the admissibility of that evidence or whether the trial court's evidentiary rulings were correct. *Id.*

(Doc. 24-32, ECF pp. 3-5.) As the state court properly identified the applicable

Supreme Court precedent, the federal habeas court must objectively evaluate

whether the state court decision was an unreasonable application of Supreme Court

precedent. The court finds it was not.

-48-

As Dontae Chambers' testimony is part of the record, it must therefore be considered along with other evidence when evaluating Mr. Lockhart's sufficiency claim, as such a claim cannot be excised from the record or disregarded.  Likewise, the fact that Mr. Chambers contradicted or altered his testimony during trial does not negate the juror's ability to evaluate his statements and believe part of his testimony and disbelieve other parts sufficient to sustain a conviction.  *Boomer v. Lewis*, 541 F. App'x 186, 190 (3d Cir. 2013)(citing *United States v. Boone*, 279 F.3d 163, 189 (3d Cir. 2002)).  As noted earlier, although Mr. Chambers testimony was a major part of the Commonwealth's case against Mr. Lockhart, it was not their only evidence.  It is undisputed that even though Mr. Chambers recanted much of the testimony he gave on direct examination, portions of his testimony contained facts not released to the public, and facts that were supported by physical evidence from the crime scene or otherwise corroborated.  These details included that: the victim was shot once with a 12-gauge shotgun, fatally injuring him; he was shot at a close distance, 12 inches or less; he was shot on the left side of his face near the corner of his mouth, the upper and lower lip; he fell backward after being shot; his corpse was doused with gasoline and burned; his body was found approximately 50 feet from the pull off area along a mountain road; a melted plastic gas container was found several feet from the victim's head.  (*Id.*, ECF pp. 92-93; Doc. 24-6, ECF pp. 2-4, 7, 9, 14, 33 and 65-66.)  Also, someone rummaged through the victim's front pockets, and personal items were found strewn near the victim's body.  (Doc. 24-7, ECF pp. 3-4 and 11-12; Doc. 24-11, ECF pp. 85-86.)  Additionally details included, statements Mr. Lockhart made to the PSP during the course of their murder

investigation concerning his familiarity with co-defendant Mr. Norris; his lack of association with any white males; his denial of involvement in the selling of drugs; and his denial of being in Shippensburg the day of the murder; and his denial of having the victim's phone number were all contradicted by Commonwealth witnesses other than Mr. Chambers.  Mr. Bull's cousin testified to seeing Mr. Lockhart meet with the victim at least twice on the day of the murder.  Lance Cpl. Gant also testified that the victim told him he was to meet with Mr. Lockhart later that night.  Mr. Norris testified that he was supposed to meet with the victim later that evening too.  James Carey, the victim's former roomate, testified that both he and the victim sold drugs for Mr. Lockhart and that when the victim paged Mr. Lockhart, he would call the victim back.  Mr. Lockhart's telephone number was found in the victim's apartment.  The victim's name and telephone number were found in Mr. Lockhart's car.  More importantly, a review of Mr. Lockhart's telephone records between January 2000 and April 2000 revealed that Sydney Bull's phone number appeared seven times.  The Commonwealth offered testimony that a few months before the murder Mr. Lockhart was seen in a grocery store, and at a gas station, in the company of his co-defendant Mr. Norris, who is a white male.  The day following the murder, Mr. Lockhart was seen with scratches on his hands.  He was also reported seen driving his girlfriend's blue Ford Probe at that time.  Mr. Lockhart had arranged to provide drugs to Mr. Gardiner, a white male, on April 24, 2000, but never made the delivery.  Finally, one of Mr. Lockhart's cellmates recounted a conversation where Mr. Lockhart responded "He should have gave it up.  They had to do what they had to do" when questioned as to why did he shoot "the brother,"

Sydney Bull.  The prisoner informant also testified that Mr. Lockhart stated that he knew the police were looking for his girlfriend's car and that he had to clean it up. When the police searched Mr. Lockhart's girlfriend's blue Ford Probe, no hair fibers or DNA belonging to Mr. Lockhart were found in the vehicle.

Taking into consideration all of this evidence as a whole, and viewing the evidence in the light most favorable to the prosecution, the court finds that the state court's conclusion that there was sufficient evidence at trial to support Mr. Lockhart's convictions is not objectively unreasonable.  Thus, habeas relief on this claim will be denied.


### 3.    Alleged *Brady* Violation.

Mr. Lockhart alleges the Commonwealth's failure to disclose Mr. Chambers' statement that Bernard Adams was present with him on the mountain the day of the murder, violated its duties under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).  He further claims the trial court erred in failing to declare a mistrial after the Commonwealth disclosed it had failed to provide his counsel with this exculpatory evidence.  This claim was raised on direct appeal.

The Superior Court of Pennsylvania, citing *Commonwealth v. Ligons*, 565 Pa. 417, 427-28, 773 A.2d 1231, 1237 (Pa. 2001) and Pa. R. Crim. P. 573(E), held that, even where a discovery violation occurs, the trial court is afforded broad discretion in fashioning a remedy, and mistrial is warranted only if the accused would be deprived of a fair trial.  To that end, the appellate court held that "a defendant seeking relief from a discovery violation must demonstrate prejudice."  (Doc. 24-32,

ECF pp. 7-8.) The standard used by the state appellate court comports with the standard announced in *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1994, 10 L.Ed.2d 215 (1963), and *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).

Prosecutors have an affirmative duty as described in *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1994, 10 L.Ed.2d 215 (1963), and *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), to advise the defendants of the existence of, and to turn over to them, all exculpatory evidence relating to the defendants.  This obligation extends to all evidence which can be used by defendants for impeachment purposes of government witnesses and in planning of defense strategies.  This prosecutorial duty is grounded in the Fourteenth Amendment.  *Brady*, 373 U.S. at 86-87, 83 S.Ct. at 1196-97.  The purpose of *Brady* is to ensure that "criminal trials are fair," *Id.* at 87, 83 S.Ct. at 1197, and to ensure that a "miscarriage of justice" does not result from suppression of evidence favorable to the accused.  *See United States v. Bagley*, 473 U.S. 667, 675, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985).  If an omission is made, the focus is not whether or not the prosecution acted in "good faith or bad faith," *Brady*, 373 U.S. at 87, 83 S.Ct. at 1197, but on the fairness of the criminal trial.  *Bagley*, 473 U.S. at 678, 105 S.Ct. at 3381.  A "fair trial" is one in which the verdict is worthy of confidence.  *Kyles v. Whitley*, 514 U.S. 419, 434, 115 S.Ct. 1555, 1566, 131 L.Ed.2d 490 (1995).

There are three components of a *Brady* violation: (1) the prosecution must

suppress or withheld evidence, (2) which is favorable to the accused; and (3) material to the defense.  *United States v. Battles*, 514 F. App'x 242, 252 (3d Cir. 2013).  To succeed on a *Brady* claim, the petitioner must show the suppressed, favorable evidence is material.  (*Id.*)  The materiality standard is satisfied "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  *Bagley*, 473 U.S. at 682, 105 S.Ct. at 3383.  "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome."  *Id*.  In order for evidence to be material, it is not necessary that the evidence establish by a preponderance that disclosure of the evidence would have resulted in an acquittal.  *Kyles*, 514 U.S. at 434-35, 115 S.Ct. at 1566.  However, in making a determination of materiality, the assessment of the omitted evidence's impact must take account of the cumulative effect of the suppressed evidence in light of the other evidence, not merely the probative value of the suppressed evidence standing alone.  *Id.* at 436–37, 115 S.Ct. at 1567.

In this instance the trial court offered the defendants several remedies as a means to address the discovery violation.  The defendants were given the opportunity to delay their cross-examination of Mr. Chambers until after they had an opportunity to interview the Troopers involved and present when Mr. Adams' name came up, or to continue with their cross-examination of Mr. Chambers.  The trial court was clear that defendants could also elect to take a recess or continuance.  (Doc. 24-5, ECF pp. 19-23.)  Although defense counsel insisted that "a mistrial was the only appropriate remedy," given the trial court's decision, defendants elected to

go forward with Mr. Chambers' cross-examination.  (*Id.*, ECF p. 19.)  Mr. Lockhart

was not forced to move forward in the case without the opportunity to investigate Mr.

Chambers' statements about Bernard Adams.  Counsel could have elected either a

short recess or continuation of trial to explore this issue.  Both defendants elected to

move forward.  Furthermore, as previously noted, both defendants had the

opportunity to cross-examine both Mr. Chambers and the PSP investigator who was

present when Mr. Chambers made the fleeting statement.[16]  No testimony was

---

[16]  Cpl. Junkin, the lead investigating officer in the murder investigation, testified that

Mr. Chambers' statement concerning Bernard Adams was not in his report because it was

immediately recanted.  On direct examination the following testimony was elicited from Cpl.

Junkin, concerning that interview:

> Q: During your interview with Dontae Chambers, did you provide
> him with any information, forensic or otherwise, with regard to
> this murder?
>
> A: No.  The only thing that I would have probably have said to
> him is, Are you familiar with the area of the wall?
>
> Q: And what did he tell you about that?
>
> A: He told me he knows it is a place where college kids and
> rednecks hang out.
>
> Q: Where is the wall with regard to - - if the red is where the
> body was found, how far away is the wall past the red dot?
>
> A: I believe it is a half mile to a mile, further up the mountain
> on Hogshead Road.
>
> Q: At any point in time during his story on the 9th, did he say
> anything to you with regard to previously being up on the
> mountain with anyone else earlier in the day?
>
> A: Yes.
>
> Q: Okay.  What did he tell you in regards to that?

(continued...)

elicited to suggest Mr. Chambers ever suggested Bernard Adams was involved in

_____

[16](...continued)

A: He stated at one point when he was discussing about the robbery of Sydney, that he had been dropped off earlier in the day up at the wall, which would have been the location half a mile to a mile from that scene. And that he and another black man were dropped off. I asked him about that.

Q: How? I mean, how did you ask him about that? Did you shout at him? Did you threaten him? What did you do?

A: No, I said another black man? I said, Who was it? He said, I don't know. I said, Dontae, you were dropped off in the middle of the mountain with a guy. Who were you dropped off with? And he said, Nard.

Q: Who you knew to be?

A: Bernard Adams.

Q: What did you say in that regard?

A: I basically sat back in my chair, folded my arms, and said, Dontae, I said, you are telling me that two black men got dropped off in the middle of the mountain, in the middle of the afternoon to hang out? And he said, No. And I said, Why?

Q: And he said?

A: Because rednecks would mess with us.

Q: Did you put that in your report at all?

A: No.

Q: Why not? I mean, here he said he was a half a mile away from the murder scene on the day with somebody else in the middle of the day. Why didn't you put that in your report, Corporal?

A: Because it was a fleeting statement. It was one of those where he started to go off. I redirected. That happens in every interview. And many interviews in this particular case where statements were made that were a quick one, and right away it was recanted, and was proven or obviously not true.

(Doc. 24-8, ECF pp. 69-71.)

the planning or murder of Sydney Bull.

Given the entirety of the evidence against Mr. Lockhart and the dubious materiality of Mr. Chambers' statement regarding Bernard Adams which failed to indicate his involvement in Sydney Bull's murder, in combination with the remedies offered by the trial court to address the discovery violation, there is no evidence of any prejudice resulting from the delayed disclosure of this evidence or the trial court's denial of a mistrial.  Mr. Lockhart has not demonstrated that he suffered any prejudice. as he was given the opportunity of a short continuance to fully investigate this matter and prepare for his cross-examination of Mr. Chambers on this subject, as well as Cpl. Junkin who conducted the interview when the statement was made. As the trial court and the state appellate court found in this instance, this court also finds that the trial court's proposed remedies were sufficient to ensure defendants received a fair trial.  (Doc. 24-32, ECF p. 8.)  The delayed disclosure of Mr. Chambers' statement regarding Bernard Adams was not demonstrated to be exculpatory or material to Mr. Lockhart's guilt or ability to impeach Mr. Chambers, especially in light of the remedies fashioned by the trial court designed to insure his fair right to trial in light of the perceived discovery violation.

Based on the foregoing, the court finds that Mr. Lockhart has failed to show either that the state court unreasonably determined the facts in his case or that the state court unreasonably applied federal law in dismissing his claim that the trial court erred to grant a mistrial in light of the prosecution's discovery violation.  As such, this claim will be denied.

**4.      Trial Court Failure to Require Mr. Chambers to Invoke his Fifth Amendment Rights in Front of Jury or Failure to Advise Jury of Grant of Transactional Immunity was not "contrary to" clearly established Federal Law.**

Mr. Lockhart's final claim is two-fold.  First, he claims the trial court erred by failing to require Mr. Chambers to invoke his Fifth Amendment rights in the presence of the jury.  Second, he claims the trial court erred by failing to advise the jury that Mr. Chambers had been granted transactional immunity to perjury charges for statements made at the preliminary hearing and portions of his trial testimony in this matter.  Mr. Lockhart claims he was prejudiced by these errors as the jury was unable to properly evaluate his credibility without this information.

The trial court and state appellate court, relying exclusively on state law held that:

> [i]t has long been the law of this Commonwealth that a witness may not be allowed to invoke his 5th Amendment rights in front of a jury. *Commonwealth v. Greene*, 445 Pa. 228, 285 A.2d 865 (1971).  Addressing an issue similar to the one before us, the *Greene* court held that "jury may not draw any inference from a witness' exercise of his constitutional rights whether the inference be favorable to the prosecution or the defense ...". 285 A.3d at 857.  The Pennsylvania Supreme Court has also recognized that:
>
> > Although it could be argued that under certain circumstances, a refusal to testify on grounds of self-incrimination might have probative value in establishing an issue in a matter to which the witness was not a party . . . it is not permissible for either defense or prosecution to attempt to capitalize on such refusal.
>
> *Commonwealth v. Todaro*, 524 Pa. 64, 69, 569 A.3d 333, 335 (1990) quoting for *Commonwealth v. Duval*, 453 Pa. 205, 307 A.2d 229, 232-233 (1973).  Based on the above

> we were satisfied that Chambers' invocation of his 5th
> Amendment rights should not have taken place in the
> presence of the jury.

(Doc. 24-33, ECF p. 10.)  With respect to the second claim, the trial court noted that

"we were never asked to advise the jury" that Mr. Chambers was granted immunity.

(*Id*.) The trial court added that:

> even if we had been asked, we would have refused to give
> such an instruction because it was a fact that could
> properly have been elicited through cross examination.
> Furthermore, we fail to see how it would have added
> anything to the truth determining process.  The jury was
> well aware that Chambers' prior sworn testimony
> exonerating the defendant.  If there was anything clear at
> the trial of this case, it was that Dontae Chambers lied
> under oath.  It was for the jury to determine which portion
> of his testimony was the lie and which portion was the truth.

(*Id*., ECF pp. 10-11.)

Mr. Lockhart does not cite any Supreme Court precedent for the proposition

that a witness who indicates his or her desire to invoke the Fifth Amendment and

then is granted immunity and elects to proceed with testifying is required to do so in

the presence of the jury.  Moreover, the court is unfamiliar with any such precedent.

Thus, we conclude that the state court's decision on this matter cannot be "contrary

to" clearly established federal law as determined by the Supreme Court.

Moreover, even if the court were to grant Mr. Lockhart's request and address

this claim, it is without merit.  As previously recited, following Mr. Chambers' direct-

examination and shortly after Mr. Norris' counsel started to cross-examine him, Mr.

Chambers requested to speak with his attorney.  The trial court took a recess and

excused the jury.  Mr. Chambers stated he wished to invoke his Fifth Amendment

rights so as not to further perjure himself with respect to false testimony provided at the defendants' preliminary hearing and thus far in trial.  All parties agreed Mr. Chambers had the right to invoke the Fifth Amendment.  Contrary to the defendants' wishes, the trial court indicated its unwillingness to have Mr. Chambers invoke his Fifth Amendment rights in the presence of the jury.  (Doc. 25-5, ECF pp. 43 - 56.) The trial judge indicated that "[i]f [Mr. Chambers] takes the Fifth Amendment and we proceed with this trial, [he] will explain to the jury why he is unavailable and he has elected to exercise his right not to incriminate himself and refused to testify any further."  (*Id.,* ECF pp. 44.)  The trial court advised defense counsel that he "will keep an open mind on that [issue] and give [them] the opportunity to show [him] case law" on the issue.  (*Id.*) There is no indication on the record that defense counsel provided the court with any authority supporting their position.  Additionally, defense counsel raised this objection prior to the prosecution granting Mr. Chambers transactional immunity.  Accordingly, the trial court never had to address whether Mr. Chambers should be required to invoke his Fifth Amendment rights in front of the jury, or in the alternative, what language the court should use to advise the jury of Mr. Chambers unavailability mid-trial because he elected to continue to testify.  In short, Mr. Chambers did not invoke his Fifth Amendment rights once guaranteed he would not be subject to perjury charges for his earlier testimony. Accordingly, there is no merit to Mr. Lockhart's claim of trial court error in refusing his request to require Mr. Chambers to invoke his Fifth Amendment rights before the jury.

Finally, there is no indication on the record that the trial court was ever asked to advise the jury that Mr. Chambers had been granted transactional immunity or that the trial court admonished counsel from addressing this issue during their cross-examination of the witness.  Thus, this issue is unexhausted and nonetheless without merit as defendants' cross-examination of Mr. Chambers was not limited in this regard.  Habeas relief on this claim will be denied.


**V.     Conclusion**

The court will issue an order denying the section 2254 petition.  The order will also deny a certificate of appealability, based on the analysis in this memorandum. *See* 28 U.S.C. § 2253(c).  However, Mr. Lockhart is advised that he has the right for thirty (30) days to appeal our order denying his 2254 petition, *see* 28 U.S.C. § 2253(a); Fed. R. App. P. 4(a)(1)(A), and that our denial of a certificate of appealability does not prevent him from doing so, as long as he also seeks a certificate of appealability from the Third Circuit Court of Appeals.  *See* Fed. R. App. P. 22; Local Rule of App. P. 22.1.

An appropriate Order follows.

/s/ A. Richard Caputo
**A. RICHARD CAPUTO**
**United States District Judge**

**Date:  August 26, 2014**